**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*Pro hac vice* Forthcoming)
Julian C. Diamond (*Pro hac vice* Forthcoming)
888 Seventh Ave, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: pfraietta@bursor.com
          jdiamond@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOHAMMAD AL-RAMAHI, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| BANK OF AMERICA, N.A., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff Mohammad Al-Ramahi, ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant Bank of America, N.A. ("BofA" or "Defendant"), based upon personal knowledge with respect to himself, and on information and belief and the investigation of counsel as to all other matters, in support thereof alleges as follows:

## INTRODUCTION

1.      This lawsuit is brought as a class action on behalf of Plaintiff and thousands of similarly situated customers of BofA who have signed up for a person to person money transfer service ("Transfer App"), such as Venmo or Zelle, and who: have been the victim of fraud on the Transfer App; have incurred losses due to that fraud and have not been reimbursed by BofA; and were entitled by federal regulations, the marketing representations of BofA, and by the BofA's contract promises to a full reimbursement of losses caused by fraud on the Transfer App.

2.      Zelle is a Transfer App wholly owned and operated by seven of the largest banks in the U.S., including by BofA.

3.      Venmo is a similar Transfer App.

4.      There are approximately 1,500 member banks and credit unions who participate in the Zelle service. Those members engage in their own significant marketing efforts to encourage their accountholders to sign-up for the Zelle service by marketing Zelle as a fast, safe, and secure way for consumers to send money. This is false. In fact, there are huge, undisclosed security risks of using the service that BofA omitted from its marketing push to get its accountholders to sign-up for Zelle.

5.      BofA prominently touts Zelle to its accountholders as a secure, free, and convenient was to make money transfers. However, it misrepresents and omits a key fact about the service that is unknown to accountholders: that there is virtually no recourse for consumers to recoup losses due to fraud. Indeed, unlike virtually every other payment method commonly used by American consumers—debit cards, credit cards, and checks—there is no protection for accountholders who are victims of fraud, and virtually no recourse for accountholders attempting to recoup losses due to fraud.

6.      For example, BofA informs accountholders that Zelle is a "safe and easy way to send money fast."[1]

7.      BofA further implies the safety of Zelle by stating that if an accountholder sends money with Zelle, their "bank information remains private."[2]

8.      The unique, misrepresented, and undisclosed architecture of the Zelle payment system means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via Zelle is gone forever, without recourse, reimbursement, or protection.

9.      Worse, BofA misrepresents and omits the truth about a secret policy it has adopted: it does not and will not reimburse its accountholders for losses on a Transfer App due to fraud, even where those losses are timely reported by accountholders.

10.     BofA was required to not misrepresent the unique and dangerous features of the Zelle service in its marketing and in contractual representations. But it failed to do so.

11.     As a result, users like Plaintiff sign-up for and use the Zelle service without the benefit of accurate information regarding that service, and later end up with huge, unreimbursed losses due to fraud. Such users never would have signed up for Zelle in the first place if they had known the extreme risks of signing up for and using the service.

12.     As a member of the Zelle network, the risks are well known to BofA but are omitted from all of its marketing regarding Zelle.

13.     As a recent New York Times investigation showed, fraud on the Zelle and Venmo networks is a widespread scourge of which banks are well aware. Quoting an industry expert, the *Times* reported:

> "Organized crime is rampant," said John Buzzard, Javelin's lead fraud analyst. "A couple years ago, we were just starting to talk about it" on apps like Zelle and Venmo, Mr. Buzzard said. "Now, it's common and everywhere."
>
> The banks are aware of the widespread fraud on Zelle. When Mr.

---

[1] https://web.archive.org/web/20200416012913/https://www.bankofamerica.com/online-banking/mobile-and-online-banking-features/send-receive-money/#panel-legal (last accessed May 25, 2022).
[2] *Id.*

1
2
3

> Faunce called [his bank] to report the crime, the customer service representative told him, "A lot of people are getting scammed on Zelle this way." Getting ripped off for $500 was "actually really good," Mr. Faunce said the rep told him, because "many people were getting hit for thousands of dollars."

4   https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html (last accessed May

5   25, 2022).

6   14.   Had Plaintiff and the Class members known of the true operation and risks of the

7   Zelle service—risks BofA was aware of and actively misrepresented—they would not have signed

8   up for and used the Zelle service.

9   15.   Plaintiff and the Class members have been injured by signing up for and using the

10  Zelle service. Plaintiff brings this action on behalf of himself, the putative Class, and the general

11  public. Plaintiff seeks actual damages, punitive damages, restitution, and an injunction on behalf of

12  the general public to prevent BofA and Zelle from continuing to engage in its illegal practices as

13  described herein.

14  **PARTIES**

15  16.   Plaintiff Mohammad Al-Ramahi ("Plaintiff") is a citizen and resident of San Jose,

16  California.  Plaintiff is a Bank of America accountholder.  Due to fraud, Plaintiff lost $2,500 on the

17  Zelle app and $2,450 on the Venmo app in April 2020.  When Plaintiff attempted to chargeback

18  these fraudulent charges, BofA refused to cover the transactions.  When Plaintiff signed up for

19  Zelle, he was not informed that Zelle's service had a significant "catch" and that significant

20  monetary losses could result from signing up for the service—or that those losses are almost never

21  reimbursed by users' banks or credit unions.

22  17.   Defendant Bank of America, N.A. is a national bank with its principal place of

23  business located in Charlotte, NC and is incorporated in Delaware. Among other services, BofA

24  operates banking centers and conducts business throughout the State of California.

25  **JURISDICTION AND VENUE**

26  18.   This Court has jurisdiction over the subject matter of this action pursuant to 28

27  U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000, exclusive of interest

28  and costs, and is a class action in which at least one member of each of the Classes is a citizen of a

1    State different from the Defendant.  The number of members of the proposed Classes in aggregate

2    exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

3           19.    This Court has personal jurisdiction over the Defendant because Defendant's actions

4    and omissions committed in or aimed at this District gave rise to the claims alleged in this

5    Complaint.  Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part

6    of the events or omissions giving rise to the claims asserted herein occurred in this District.

7                      **FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

8           **A.    Overview**

9           20.    It is free to sign-up with Zelle, and Zelle is in fact integrated into the websites and

10   mobile apps of BofA. In marketing and within the website and app itself, BofA encourages its

11   accountholders to sign-up for the Zelle service—a sign-up that occurs quickly within the BofA

12   website or mobile app. During that sign-up process, a user provides basic information to Zelle to

13   link into the Zelle network.

14          21.    While Zelle provides a link to what it calls a "User Agreement" on its website, at no

15   time during the sign-up process on the bank's website or app did Plaintiff agree to be bound by that

16   document.

17          22.    Signing up for the Zelle service allows the fast transfer of a user's account funds to

18   other Zelle users.

19          23.    Created in 2017 by the largest banks in the U.S. to enable instant digital money

20   transfers, Zelle is by far the country's most widely used money transfer service. In 2021, users sent

21   $490 billion in immediate payment transfers through Zelle.

22          24.    The Zelle network is operated by Early Warning Services, a company created and

23   owned by seven banks: Bank of America, Capital One, JPMorgan Chase, PNC, Truist, U.S. Bank,

24   and Wells Fargo.

25          25.    The Zelle service is very popular, but it also has a massive fraud problem—in no

26   small part because of the immediacy with which money transfers are made on the service. If a

27   fraudster removes money from a Zelle user's bank account, either directly or by fooling the Zelle

28   user to transfer money, those funds are unrecoverable to the consumer.

26.     Nearly 18 million Americans were defrauded through scams involving person-to-person payment apps like Zelle in 2020 alone, according to Javelin Strategy & Research, an industry consultant.

27.     Organized crime is rampant on Zelle and other similar person-to-person transfer services.

28.     The 1,500 banks and credit unions who are members of the Zelle network, including BofA, know full well that they have a widespread fraud problem on their hands, but have misrepresented and failed to take reasonable steps to warn their accountholders of these risks—or to protect their accountholders who fall prey to fraud.

29.     For example, a common scam involves a scammer impersonating a bank employee and requesting that the accountholder transfer money to a different bank account for testing purposes. In many cases, unsuspecting Zelle users, tricked into making a fraudulent transfer, send hundreds or thousands of dollars to fraudsters.

30.     In another very common scheme, a Zelle user's phone is stolen and Zelle transfers are made from the stolen phone to the fraudster.

31.     Yet another common scheme involves posting a fake employment advertisement online to which victims respond.  The victims will quickly be "hired" and told that part of their duties will include paying for goods and supplies.  The victims will be sent a check and then quickly told to complete transaction requests on Zelle.  Only after the check bounces a few days later will the victim realize that they have been defrauded.  It was this type of scam to which Plaintiff fell victim.

32.     In short, and unbeknownst to average Zelle users, the Zelle network has become a preferred tool for fraudsters like romance scammers, cryptocurrency con artists, and those who use social media sites to advertise fake concert tickets and purebred puppies.

33.     Scams like these are rampant on the Zelle network precisely because of the design and architecture of the network, specifically that a money transfer is instantaneous and unrecoverable. Indeed, there is virtually no recourse for consumers to recoup losses due to fraud, unlike other payment methods commonly used by American consumers—debit cards, credit cards,

and checks. Zelle provides no protection for accountholders who are victims of fraud, and BofA provides virtually no recourse for accountholders attempting to recoup losses due to fraud.

34.     The unique, misrepresented, and undisclosed architecture of the Transfer App payment systems and BofA's own fraud policies means—again, unlike other payment options commonly used by American consumers—that virtually any money transferred for any reason via a Transfer App is gone forever, without recourse, reimbursement, or protection for victimized accountholders.

**B.      BofA Falsely Markets Zelle as a Safe and Secure Way to Transfer Money, Omits Information Regarding the Extreme Risks of Signing Up for and Using the Service, and Misrepresents Fraud Protections Regarding Zelle in its Account Contract**

35.     In its marketing about Zelle and during the Zelle sign-up process within the Bank's mobile app or website, the Bank makes repeated promises that Zelle is a "**safe** and easy way to send money fast" (emphasis added).

36.     It also states: "Send money quickly and **safely** with Zelle" (emphasis added).

37.     BofA promises that "your bank information remains private" when sending money via Zelle.

38.     At no time in its marketing or during the sign-up process does BofA reasonably warn potential users of the true security risks of using the Zelle service—including the risk of fraud and the risk that fraudulent losses will never be reimbursed by BofA.

39.     Zelle's services can cause unsuspecting consumers like Plaintiff to incur massive losses on their linked bank accounts.

40.     BofA misrepresents (and omits facts about) the true nature, benefits, and risks of the Zelle service, which means that users are at extreme and undisclosed risk of fraud when using Zelle. Had Plaintiff been adequately informed of these risks, he would not have signed up for or used Zelle.

41.     The Bank's marketing representations about Zelle—including within its app and website—misrepresent and never disclose these risks and material facts, instead luring accountholders to sign-up for and use the service with promises of ease, safety, and security.

42.     These representations—which all users view during the sign-up process—are false and contain material omissions.

43.     BofA misrepresents the true nature, benefits, and risks of the service, which burden users with an extreme and undisclosed risk of Zelle causing losses due to fraud. Plaintiff would not have used Zelle if he had been adequately informed of the risks.

44.     The Bank's misrepresentations and omissions are especially pernicious because BofA alone knows a crucial fact regarding Zelle transfers that occur on its accountholders' accounts: as a matter of secret bank policy, fraud-induced Zelle transfers will almost never be reimbursed to accountholders.

45.     Indeed, BofA maintains a secret policy whereby it refuses to reimburse fraud losses incurred via Zelle, even where its accountholders timely inform BofA of the fraud.

46.     BofA misrepresents and fails to disclose this secret policy.

47.     Further, BofA's Deposit Agreement & Disclosures applicable to consumer accounts repeatedly promises users that, if they timely report fraud, such fraud will be fairly investigated and accountholders will not be liable for fraudulent transfers:

> **In Case of Errors or Questions About Your Electronic Transactions**
> …
> Contact us immediately if you think:
> -Your statement or transaction record is wrong
> -You need more information about a transaction listed on your statement
> -An unauthorized person has discovered your Online Banking passcode
> -Someone has transferred or may transfer money from your account without your permission
> -Bill payment transactions have been made without your authorization
> …
> **Limitation of Liability for Online Banking Transactions**
> Tell us at once if you believe your Online Banking passcode has been compromised or if someone has transferred or may transfer money from your account without your permission. The best way to minimize your loss is to call us immediately. The unauthorized use of your Online Banking services could cause you to lose all of your money in your accounts, plus any amount available under your overdraft protection plan. You will have no liability for unauthorized transactions if you notify us within 60 days after the statement

showing the transaction has been mailed to you (or 90 days if the transaction was from an account maintained at another financial institution).

…

Our liability policy regarding unauthorized debit card or ATM Card transactions, and unauthorized Online Banking transactions on consumer deposit accounts may give you more protection, provided you report the transactions promptly...Also, the state law applicable to your account may give you more time to report an unauthorized transaction or may give you more protection.

…

**Contacting Bank of America**

For general questions, to request cancellation of payments and transfers, or to report unauthorized transactions please call us at 800.432.1000. Business Online Banking Customer Service is available from 7:00 a.m. to 10:00 p.m. local time, seven (7) days a week, excluding bank holidays. You may also write us at:

*See* Bank of America Service Agreement.[3]

48.     These provisions are and were reasonably understood by Plaintiff to mean that Plaintiff would not be liable for electronic funds transfers effectuated by fraud.

**C.     BofA is Legally Required to Cover Unauthorized Fraudulent Transactions**

49.     The Electronic Fund Transfer Act ("EFTA") and Regulation E apply to an electronic fund transfer that authorizes a financial institution to debit or credit a consumer's account. 12 CFR 1005.3(a).

50.     The term "electronic fund transfer" or "EFT" means any transfer of funds that is initiated through an electronic terminal, telephone, computer, or magnetic tape for the purpose of ordering, instructing, or authorizing a financial institution to debit or credit a consumer's account. 12 CFR 1005.3(b)(1).

51.     Accordingly, Regulation E applies to any person-to-person (P2P) or mobile payment transactions that meet the definition of EFT, including debit card, ACH, prepaid account, and other electronic transfers to or from a consumer account. 12 CFR 1005.3(b)(1)(v); Comment 3(b)(1)-1.ii.

52.     According to the Consumer Financial Protection Bureau ("CFPB"), "Person-to-person" or "P2P" payments allow a consumer to send money to another person without needing to

---

[3] https://web.archive.org/web/20200601220133/https://www.bankofamerica.com/online-banking/service-agreement.go (last accessed May 27, 2022).

write a check, swipe a physical card, or exchange cash. Depending on the payment provider, a P2P payment can be initiated from a consumer's online bank account portal, prepaid account portal, or mobile application. Any P2P payment that meets the definition of EFT is covered by EFTA and Regulation E."[4]

53.     Any P2P payment provider can be a financial institution under Regulation E. Thus, if a P2P payment provider directly or indirectly holds an account belonging to a consumer, they are considered a financial institution under Regulation E. 12 CFR 1005.2(i).[5]

54.     If a consumer notifies a financial institution within two business days after learning of a loss due to an unauthorized transfer, the consumer's liability shall not exceed the lesser of $50 or the amount of unauthorized transfers that occur before notice to the financial institution.  12 C.F.R. § 1005.6(b)(1).

55.     Even if the consumer fails to notify the financial institution within two business days after learning of the loss or theft of the access device, the consumer's liability shall not exceed the lesser of $500 or the sum of: (i) $50 or the amount of unauthorized transfers that occur within the two business days, whichever is less; and (ii) [t]he amount of unauthorized transfers that occur after the close of two business days and before notice to the institution, provided the institution establishes that these transfers would not have occurred had the consumer notified the institution within that two-day period. 12 C.F.R. § 1005.6(b)(2).

56.     If the consumer's delay in notifying the financial institution was due to extenuating circumstances, the institution shall extend the times specified above to a reasonable period.  12 C.F.R. § 1005.6(b)(4).

57.     The CFPB has made it clear that a transaction that is fraudulently induced by a third party is an unauthorized electronic funds transfer subject to the limitations of liability in 12 C.F.R. § 1005.6.[6]

---

[4] https://www.consumerfinance.gov/compliance/compliance-resources/deposit-accounts-resources/electronic-fund-transfers/electronic-fund-transfers-faqs/ (last accessed May 25, 2022).
[5] *Id.*
[6] https://www.consumerfinance.gov/rules-policy/regulations/1005/2/#m ("An unauthorized EFT includes a transfer initiated by a person who obtained the access device from the consumer through fraud") (last accessed May 25, 2022).

58.     "Negligence by the consumer cannot be used as the basis for imposing greater liability than is permissible under Regulation E."[7]

59.     A separate regulation, Regulation Z, also requires Defendant to cover extensions of credit that are "not made to the consumer or to a person who has actual, implied, or apparent authority to use the consumer's credit card or open-end credit plan." 12 C.F.R. § 1026.13(a)(1).

60.     Because of Zelle's failure to cover fraudulently induced transactions. Senators Robert Menendez and Elizabeth Warren sent a letter to the CEO of Zelle noting:

> The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act protected victims of fraudulent money transfers, **including those who were "induced" into transferring the money themselves**, while the FDIC issued a report in March 2022 finding that both the banks and the platform – in this case Zelle – were held responsible for fraudulent electronic transfers through Regulation E

*See* **Exhibit 1**, Menendez Letter to Zelle on Scams and Fraud (emphasis added).

### D.     Plaintiff's Experience

61.     In April 2020, Plaintiff responded to a job posting about an "Admin Position" on indeed.com.

62.     On April 18, 2020, Plaintiff received an email from someone identifying themselves as Mark Moton, stating that Plaintiff will be expected to carry out various duties, including paying for goods and supplies.  Plaintiff was told that the payment will be arranged with the CFO, who will mail the payment to Plaintiff, and which Plaintiff would be required to use to pay for supplies.

63.     On April 21, 2020, Plaintiff received a check for $4,950, which he deposited into his account.

64.     BofA allowed this check to clear and made the sum available to Plaintiff.

65.     On April 24, 2020, the job offeror initiated a fraudulent transaction of $2,500.00 by requesting that Plaintiff send that amount using the Zelle service linked to his BofA bank account.

66.     On the same day, the job offeror also initiated a fraudulent transaction of $2,450.00 by requesting that Plaintiff send that amount using the Venmo app linked to his BofA bank account.

---

[7] https://www.consumerfinance.gov/rules-policy/regulations/1005/interp-6/#6-a-Interp-1-ii (last accessed May 25, 2022).

67.     Plaintiff dutifully completed both transactions as part of what he thought was his new job.

68.     Unbeknownst to Plaintiff, the job offer was fraudulent and he had fallen victim to a scam that caused him to lose $4,950.

69.     Plaintiff was not aware that he had been defrauded until April 28, 2020 when BofA informed him that the check that he deposited was altered/fictitious.  As a result, BofA deducted $4,962.00 from Plaintiff's bank account, $4,950 of which was the amount of the returned item.  To add insult to injury, BofA also charged him $12.00 for a return items fee.

70.     At this point, Plaintiff was distraught and desperately attempted to recover his badly needed funds.

71.     On the same day, he contacted Venmo, Zelle, and BofA to explain that he was the victim of fraudsters who had taken $4,950 of his money without his authorization.

72.     Plaintiff also left a complaint with the Internet Crime Complaint Center.

73.     Zelle, Venmo, and BofA all refused to cover the transactions in question or help him in any manner whatsoever.

## CLASS ALLEGATIONS

74.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

75.     The proposed classes are defined as:

**The Nationwide Zelle Class**

> All persons with a BofA account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud (the "Zelle Class").

**The Nationwide Transfer App Class**

> All persons who used a person-to-person payment application, including Zelle or Venmo, that was linked to their BofA consumer account and incurred unreimbursed losses due to fraud (the "Transfer Class").

**The California Zelle Subclass**

> All California persons with a BofA account who signed up for the Zelle Service and incurred unreimbursed losses due to fraud (the "California Zelle Subclass").

**The California Transfer App Class**

> All California persons with a BofA account who used a person-to-person payment application, including Zelle or Venmo, that was linked to their BofA consumer account and incurred unreimbursed losses due to fraud (the "California Transfer App Sublass").

The nationwide classes and California subclasses are collectively referred to as the "Classes."

76.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

77.     Specifically excluded from the Classes are BofA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BofA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

78.     The members of the Classes are so numerous that joinder is impractical.  The Classes consist of hundreds of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BofA's records.

79.     The claims of the representative plaintiff are typical of the claims of the Classes in that the representative plaintiff, like all members of the Classes, was similarly injured through Defendant's uniform misconduct as alleged above. As alleged herein, Plaintiff, like the members of the Classes, was deprived of monies that rightfully belonged to him.  Further, there are no defenses available to Defendant that are unique to Plaintiff.  Furthermore, the factual basis of BofA's misconduct is common to all members of the Classes, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.  Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

80.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual members of the Classes.

81.     The questions of law and fact common to the Classes include:

   a.   Whether Defendant's representations and omissions about the Transfer Apps are false, misleading, deceptive, or likely to deceive;

   b.   Whether Defendant failed to disclose the risks of using the Zelle service;

   c.   Whether Plaintiff and the Class members were damaged by Defendant's conduct;

   d.   Whether Defendant's actions or inactions violated the consumer protection statuteinvoked herein;

   e.   Whether these practices violated California and federal law;

   f.   The proper method or methods by which to measure damages;

   g.   Whether Defendant is legally required to cover transactions that Plaintiff and Class members were fraudulently induced to enter into; and

   h.   The declaratory, injunctive, and other equitable relief to which the Classes are entitled.

82.     Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

83.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BofA, no class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Classes will continue to suffer losses and BofA's misconduct will proceed without remedy.

84.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might

otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

85.     Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all members of the Classes, is at risk of being victimized by future fraudulent transactions that BofA will refuse to cover. Plaintiff and the members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain BofA from continuing to commit its unfair and illegal actions.

86.     BofA has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

**CAUSES OF ACTION**

**COUNT I**
**Breach Of Contract and Breach of the Covenant Of Good Faith And Fair Dealing**
**(On Behalf Of The Classes)**

87.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

88.     Plaintiff brings this claim on behalf of the Nationwide Zelle Class and California Zelle Subclass.

89.     Plaintiff and members of the Classes contracted with BofA for checking account services, as embodied in the Deposit Agreement & Disclosures.

90.     BofA breached the terms of its contract with consumers when, as described herein, BofA failed to fairly investigate reported fraudulent transactions on the Transfer Apps and failed to reimburse accountholders for fraud-induced losses incurred from using the Transfer Apps.

91.     Further, under the law of each of the states where BofA does business, an implied covenant of good faith and fair dealing governs every contract. The covenant of good faith and fair dealing constrains Defendant's discretion to abuse self-granted contractual powers.

92.     This good faith requirement extends to the manner in which a party employs discretion conferred by a contract.

93.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

94.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Other examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

95.     Defendant breached the covenant of good faith and fair dealing when it failed to fairly investigate reported fraudulent transactions on the Transfer Apps and failed to reimburse accountholders for fraud-induced losses incurred using the Transfer Apps.

96.     Each of Defendant's actions was done in bad faith and was arbitrary and capricious.

97.     Plaintiff and members of the Classes have performed all of the obligations imposed on them under the contract.

98.     Plaintiff and members of the Classes have sustained monetary damages as a result of BofA's breaches of the contract and the covenant of good faith and fair dealing.

## COUNT II
### Violation of California Unfair Competition Law
### Business and Professions Code § 17200
### (On Behalf of the California Subclasses)

99.     Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

100.    Plaintiff brings this claim on behalf of the California Zelle Subclass and the California Transfer App Subclass.

101.    BofA's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, *et seq.*

102.    The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose

1    is to protect both consumers and competitors by promoting fair competition in commercial markets

2    for goods and services. In service of that purpose, the Legislature framed the UCL's substantive

3    provisions in broad, sweeping language.

4          103.    By defining unfair competition to include any "any unlawful, unfair or fraudulent

5    business act or practice," the UCL permits violations of other laws to be treated as unfair

6    competition that is independently actionable, and sweeps within its scope acts and practices not

7    specifically proscribed by any other law.

8          104.    The UCL expressly provides for injunctive relief, and also contains provisions

9    denoting its public purpose. A claim for injunctive relief under the UCL is brought by a plaintiff

10   acting in the capacity of a private attorney general. Although the private litigant controls the

11   litigation of an unfair competition claim, the private litigant is not entitled to recover compensatory

12   damages for his own benefit, but only disgorgement of profits made by the defendant through unfair

13   or deceptive practices in violation of the statutory scheme or restitution to victims of the unfair

14   competition.

15         105.    As alleged herein, BofA's conduct violates the UCL's "unfair" prong insofar as

16   BofA regularly:

17            a.  Knowingly and intentionally makes false or misleading representations that it

18               provides "safe" and "secure" Zelle money transfer service through its website

19               and mobile app;

20            b.  Knowingly  and intentionally conceals and fails to disclose material facts

21               regarding the true risks of utilizing the Zelle money transfer service through its

22               website and mobile app;

23            c.  Deceives reasonable consumers, who expect their bank to fully investigate and

24               protect fraudulent losses incurred using Transfer Apps; and

25            d.  Omits the security risks of using the Zelle service, including the risk of fraud and

26               the risk that fraudulent losses will never be reimbursed by BOFA as a matter of

27               secret policy.

28

106.     As alleged above, BofA's conduct also violates the UCL's "unlawful" prong insofar as BofA regularly refuses to cover transactions that Plaintiff and class members were fraudulently induced to enter into despite being required to by federal and state regulations.

107.     BofA's conduct was not motivated by any legitimate business, economic need, or rationale. The harm and adverse impact of BofA's conduct on members of the general public were neither outweighed nor justified by any legitimate reasons, justifications, or motives.

108.     The harm to Plaintiff and members of the California Subclasses arising from BofA's unfair practices outweighs the utility, if any, of those practices.

109.     BofA's unfair business practices as alleged herein are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to Plaintiff, members of the California Subclass, and the general public.

110.     BofA's conduct was substantially injurious to consumers in that they have suffered monetary injury on the Zelle apps.  Had Plaintiff known the true risks of using the Zelle service, he never would have signed up for and used the Zelle service.

111.     Moreover, BofA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it affirmatively and knowingly stated that it provides "safe" and "secure" Zelle money transfer service through its website and mobile app. Such representations misled the Plaintiff and are likely to mislead the public. Additionally, Defendant's willfully and intentionally concealed and omitted the security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by BofA. As a matter of secret policy, this is a practice that is likely to deceive a consumer acting reasonably under the circumstances, to the consumer's detriment.

112.     Plaintiff relied on BofA's misrepresentations and material omissions. Specifically, Plaintiff had no idea that Defendant would refuse to cover fraudulent transactions. If Plaintiff knew BofA would not cover fraudulent transactions, he would have switched banks to a bank that did not use this practice. Such misrepresentations and omissions misled Plaintiff and are likely to mislead the public. Plaintiff seeks to enjoin BofA from misrepresenting and/or omitting this material and

1  accurate information in the documents that it makes available to existing accountholders and the

2  general public who might consider banking with BofA.

3     113.   Plaintiff and members of the California Subclass relied on BofA's

4  misrepresentations and omissions in that Plaintiff received and reviewed the materials provided by

5  BofA, and like any reasonable customer, understood these documents to mean that in the event he

6  was the victim of a fraudulent transaction, BofA would cover the transaction. Had Plaintiff and

7  others been informed in any of the documents provided by BofA that they would be subject to these

8  practices, they would not have used Zelle.

9     114.   Moreover, BofA committed unlawful business acts and practices in violation of Cal.

10  Bus. & Prof. Code § 17200, *et seq.*, when it violated the CLRA, as alleged herein.

11     115.   As a result of BofA's violations of the UCL, Plaintiff and members of the California

12  Subclass have suffered, and/or will continue to suffer from Defendant's unfair policies, and thereby

13  have suffered and will continue to suffer actual damages.

14     116.   Absent injunctive and public injunctive relief prohibiting BofA from misrepresenting

15  and omitting material information concerning its unfair policies at issue in this lawsuit, Plaintiff and

16  other existing accountholders, and the general public will be exposed to BofA's conduct violative of

17  the UCL.

18

**<u>COUNT III</u>**
**Consumer Legal Remedies Act (CLRA) Cal. Civ. Code 1750 *et seq.***
**(On Behalf Of The Subclasses)**

19

20     117.   Plaintiff incorporates by reference each of the allegations set forth in the preceding

21  paragraphs.

22     118.   Plaintiff brings this claim on behalf of the California Zelle Subclass.

23     119.   Plaintiff and each of the members of the Subclasses are "consumers" within the

24  meaning of Civil Code § 1761(d).

25     120.   Plaintiff and Subclass members engaged in "transactions" with BofA within the

26  meaning of Civil Code § 1761(e).

27     121.   BofA's provision of electronic payment services are "services" within the meaning

28  of § 1761(b).

122.    BofA's actions, representations, and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or that have resulted, in the sale of goods or services to any consumer.

123.    The CLRA expressly provides for injunctive relief, and also contains provisions denoting its public purpose. A claim for injunctive relief under the CLRA is brought by a plaintiff acting in the capacity of a private attorney general.

124.    As detailed above, BofA has engaged, and continues to engage, in unfair methods of competition and has undertaken unfair or deceptive acts or practices in violation of the CLRA by, inter alia:

    a.    Knowingly and intentionally making false or misleading representations that it provides "safe" and "secure" Zelle money transfer service through its website and mobile app;

    b.    Knowingly  and intentionally concealing and failing to disclose material facts regarding the true risks of utilizing the Zelle money transfer service through its website and mobile app;

    c.    Deceiving reasonable consumers, who expect their bank to fully investigate and protect fraudulent losses incurred using the Zelle service; and

    d.    Omitting the security risks of using the Zelle service, including the risk of fraud and the risk that fraudulent losses will never be reimbursed by BOFA as a matter of secret policy.

125.    BofA made material misrepresentations and/or omissions concerning each of these practices upon which Plaintiff relied.

126.    Specifically, Plaintiff relied on BofA's misrepresentations and material omissions regarding its fraud protection. Such misrepresentations and omissions misled Plaintiff and are likely to mislead the public. Plaintiff seeks to enjoin BofA from misrepresenting and/or omitting this material and accurate information in the documents that it makes available to the public.

127.    Plaintiff and members of the Subclasses relied on BofA's misrepresentations and omissions in that Plaintiff received and reviewed the materials provided by BofA.  Had Plaintiff

1    been informed in any of the documents provided by BofA that he would be subject to these unfair

2    practices, he would have been able to weigh the convenience and benefits in engaging in

3    transactions against the cost of the risks associated with using Transfer App services.

4        128.    Plaintiff and the members of the Subclasses are injured in fact and have lost money

5    as a direct and proximate result of BofA's unfair methods of competition and/or deceptive acts or

6    practices in that they incurred fees that were improper.

7        129.    Plaintiff and the members of the Subclasses seek declaratory relief, injunctive relief,

8    and all other relief allowable under Bus. & Prof. Code § 17203, including but not limited to

9    enjoining BofA from continuing to engage in the unfair, unlawful, and fraudulent conduct alleged

10   herein.

11       130.    As a result of BofA's violations of the CLRA, Plaintiff and members of the

12   California Subclass have paid, and/or will continue to pay improperly charged fees and thereby

13   have suffered and will continue to suffer actual damages.

14       131.    Absent injunctive and public injunctive relief prohibiting BofA from misrepresenting

15   and omitting material information concerning its policies at issue in this lawsuit, Plaintiff and other

16   existing accountholders, and the general public will be exposed to BofA's conduct violative of the

17   CLRA.

18                                **PRAYER FOR RELIEF**

19       WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

20   judgment against Defendant, as follows:

21           (a)    For an order certifying this action as a class action, appointing Plaintiff as

22                  Class Representative, and appointing Plaintiff's counsel as Class Counsel;

23           (b)    For compensatory and statutory damages on all applicable claims and in an

24                  amount to be proven at trial;

25           (c)    For restitution on all applicable claims and in an amount to be proven at trial;

26           (d)    For an order requiring Defendant to disgorge, restore, and return all monies

27                  wrongfully obtained together with interest calculated at the maximum legal

28                  rate;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    20

1    (e)    For an order enjoining the wrongful conduct alleged herein;

2    (f)    For other appropriate injunctive and other equitable relief;

3    (g)    For costs;

4    (h)    For pre-judgment and post-judgment interest as provided by law;

5    (i)    For attorneys' fees under the account contracts, the common fund doctrine,

6            and all other applicable rules and law; and

7    (j)    For such other relief as the court deems just and proper.

8                    **<u>DEMAND FOR TRIAL BY JURY</u>**

9        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

10   and all issues in this action so triable of right.

11
     Dated:  May 27, 2022                    Respectfully submitted,
12
                                             **BURSOR & FISHER, P.A.**
13
                                             By:   <u>/s/ L. Timothy Fisher</u>
14                                                   L. Timothy Fisher

15                                           L. Timothy Fisher (State Bar No. 191626)
16                                           1990 North California Boulevard, Suite 940
                                             Walnut Creek, CA  94596
17                                           Telephone: (925) 300-4455
                                             Facsimile: (925) 407-2700
18                                           E-Mail:  ltfisher@bursor.com

19                                           **BURSOR & FISHER, P.A.**
20                                           Philip L. Fraietta (*Pro hac vice* Forthcoming)
                                             Julian C. Diamond (*Pro hac vice* Forthcoming)
21                                           888 Seventh Ave, Third Floor
                                             New York, NY 10019
22                                           Telephone: (646) 837-7150
                                             Facsimile: (212) 989-9163
23                                           E-Mail: pfraietta@bursor.com
                                                     jdiamond@bursor.com
24
25                                           *Attorneys for Plaintiff*

26

27

28

---
CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                           21

**EXHIBIT 1**

# United States Senate

### WASHINGTON, DC 20510

April 26, 2022

Al Ko
Early Warning Services, LLC
16552 N 90th St
Scottsdale, AZ 85260

Dear Mr. Ko,

We write regarding disturbing reports of a rise in fraud and scams on your online peer-to-peer money transfer platform Zelle, and the ongoing failure by Zelle or the banks that own this service to address these scams and provide appropriate redress to defrauded consumers. This "widespread fraud" on money transfer apps has affected nearly 18 million Americans.[1] Given the rise of increasingly sophisticated scams on your platform and the widely documented difficulties consumers have faced in seeking relief from banks, we seek to understand the extent to which Zelle allows fraud to flourish and the steps your company is taking to increase consumer protection and help users recover lost funds.

After its introduction in 2017, Zelle exploded in popularity, in large part because its connections to large financial institutions allowed it to sell itself as "fast, free, and ubiquitous."[2] Your company, Early Warning Services, LLC is owned by seven of the country's biggest banks, including JP Morgan Chase & Co., Bank of America, and Wells Fargo, giving consumers the convenience of an integrated platform and providing an implicit promise that activity on the platform is as secure as activity at the bank teller window.[3] In 2021, Zelle "drove $490 billion in transactions, more than double Venmo's $230 P2P volume."[4]

The increased activity on Zelle is putting millions of consumers at risk as fraud flourishes:

> Police reports and dispatches from industry analysts make it clear that the network has become a preferred tool for grifters like romance scammers, cryptocurrency con artists, and those who prowl social media sites advertising concert tickets and purebred puppies — only to disappear with buyers' cash after they pay.[5]

---

[1] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.
[2] New York Times, "Cash Faces a New Challenger in Zelle, a Mobile Banking Service," Stacy Cowley, June 12, 2017, https://www.nytimes.com/2017/06/12/business/dealbook/mobile-banking-zelle-venmo-apple-pay.html.
[3] Early Warning Services, LLC, website accessed Apri 25, 2022, https://www.earlywarning.com/about; New York Times, "Cash Faces a New Challenger in Zelle, a Mobile Banking Service," Stacy Cowley, June 12, 2017, https://www.nytimes.com/2017/06/12/business/dealbook/mobile-banking-zelle-venmo-apple-pay.html.
[4] American Banker, "Can Zelle change the narrative around P2P fraud?," Kate Fitzgerald, March 9, 2022, https://www.americanbanker.com/payments/news/can-zelle-change-the-narrative-around-p2p-fraud.
[5] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.

Reports of consumers losing thousands of dollars have come out of California,[6] Massachusetts,[7] and Georgia.[8] These scams, many of which involve a scammer creating a Zelle account linked to the consumer's own phone number, have cost victims their life savings and robbed them of funds essential to their small businesses, further underscoring the consequences of this widespread fraud.[9]

Alarmingly, both your company and the big banks who both own and partner with the platform have abdicated responsibility for fraudulent transactions, leaving consumers with no way to get back their funds. Zelle's biggest draw – the immediacy of its transfers – also makes scams more effective and "a favorite of fraudsters," as consumers have no option to cancel a transaction even moments after authorizing it.[10] And banks have chosen to let consumers suffer, blaming them for authorizing fraudulent transactions.[11] According to Consumer Watchdog, banks were essentially "throw[ing] up their hands and say 'it's not our problem because you authenticated it.'"[12] A former executive at your company even argued that banks have not done enough to deter fraud on Zelle, warning that banks had not sufficiently educated consumers about the risks.[13] One customer observed that "it's like the banks have colluded with the sleazebags on the street to be able to steal."[14]

The policies of your company and the banks that own and operate on it create a confusing and unfair environment for consumers, who are already facing "rampant" and sophisticated threats from spammers on the platform.[15] The Consumer Financial Protection Bureau previously clarified that Regulation E of the Electronic Fund Transfer Act protected victims of fraudulent money transfers, including those who were "induced" into transferring the money themselves,[16] while the FDIC issued a report in March 2022 finding that both the banks and the platform – in

---

[6] ABC 7 News, "LA woman loses over $18K through 'Zelle' after scammers text, call her pretending to be bank," Carlos Granda, March 12, 2022,  https://abc7.com/los-angeles-zelle-scam-text-message/11644167/.
[7] Boston 25 News, ""They're not robots talking to you. They're actual people." Zelle app users warn of latest scams," Chris Flanagan, March 23, 2022, https://www.boston25news.com/news/massachusetts/theyre-not-robots-talking-you-theyre-actual-people-zelle-app-users-warn-latest-scams/WJZVXE23JZFCTPBD5XOPZZXF6I/.
[8] WBS-TV, "Zelle warns about scams, says it's not responsible for funds stolen through app," Ashli Lincoln, March 28, 2022,  https://www.wsbtv.com/news/local/zelle-warns-about-scams-says-its-not-responsible-funds-stolen-through-app/ZTCNAVOTTNG5RNTAOAXPWELXB4/.
[9] *Id.*
[10] KARE 11, "Two Minnesota women were tricked by the same scam on Zelle, here's how you can protect yourself," Gordon Severson, March 22, 2022, https://www.kare11.com/article/money/minnesota-women-tricked-by-the-same-scam-on-zelle-heres-how-you-can-protect-yourself/89-3016a498-c8db-407a-ab1f-632f24204d9a; New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.
[11] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.
[12] ABC 7, "Calif. woman loses over $18K through 'Zelle' after scammers text, call her pretending to be bank," Carlos Granda, March 14, 2022, https://abc7news.com/zelle-scam-electronic-withdrawals-bank-of-america/11650620/.
[13] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.
[14] *Id.*
[15] *Id.*
[16] Boston 25 News, ""They're not robots talking to you. They're actual people." Zelle app users warn of latest scams," Chris Flanagan, March 23, 2022, https://www.boston25news.com/news/massachusetts/theyre-not-robots-talking-you-theyre-actual-people-zelle-app-users-warn-latest-scams/WJZVXE23JZFCTPBD5XOPZZXF6I/.

this case Zelle – were held responsible for fraudulent electronic transfers through Regulation E.[17] Given this regulatory landscape, your company and the banks have a clear responsibility to more aggressively protect consumers.

In order to better understand how consumers have experienced fraud on your platform we ask that you provide answers to the following questions by May 10, 2022:

1. What are the procedures for rooting out scams on the online platform Zelle, and how has your company adjusted those procedures in light of "rampant […] organized crime"[18] on the platform?
2. What are Zelle's policies for determining which consumers receive refunds for fraudulent claims?
    a. Is this a joint process with the account holders' bank? If so, are these procedures standardized across all banks and financial institutions using the platform?
3. Does Regulation E of the Electronic Fund Transfers Act apply to the scams seen regularly on Zelle, including those that involve consumers induced into authorizing fraudulent transfers?
    a. Under Regulation E, would Early Warning Services, LLC or the account holders' bank be responsible for refunding the funds?
4. How many reports of fraud from Zelle customers have Early Warning Services received for each of the last five full calendar years, and from January 1, 2022, to the present? For each year, and for the period from January 1, 2022, to the present, please provide:
    a. The total number of reported cases of fraud from Zelle customers.
    b. The total dollar value of reported fraud.
    c. The number of cases where Zelle provided refunds to customers.
    d. The total value of these refunds.
    e. The number of cases where Zelle referred fraud to law enforcement or to federal or state bank regulators,

Thank you for your attention to this matter.

Sincerely,

Elizabeth Warren
United States Senator

Robert Menendez
United States Senator

---

[17] Consumer Finance Monitor, "FDIC Consumer Compliance Supervisory Highlights looks at unauthorized EFTs, overdraft programs, re-presentment of unpaid transactions, and fair lending," John L. Culhane, Jr., April 7, 2022, https://www.consumerfinancemonitor.com/2022/04/07/fdic-consumer-compliance-supervisory-highlights-looks-at-unauthorized-efts-overdraft-programs-re-presentment-of-unpaid-transactions-and-fair-lending/.
[18] New York Times, "Fraud Is Flourishing on Zelle. The Banks Say It's Not Their Problem," Stacy Cowley and Lananh Nguyen, March 6, 2022, https://www.nytimes.com/2022/03/06/business/payments-fraud-zelle-banks.html.